# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CEOLIA WILLIAMS DUNN** | **CIVIL ACTION** |
| **VERSUS** | **NO:  05-4145-ILRL-SS** |
| **WASHINGTON CORRECTIONAL INSTITUTE, et al** | |

## ORDER AND REASONS

Before the undersigned is the motion of the defendant, State of Louisiana, through the Department of Public Safety and Corrections ("DOC"), for summary judgment seeking dismissal of the claims of the plaintiff, Ceolia Dunn ("Dunn"), with prejudice.  For the reasons described below, the motion is granted.

## PROCEDURAL BACKGROUND

On August 26, 2005, Dunn filed a complaint in proper person against the Washington Correctional Institute ("WCI").[1]  Rec. doc. 1.  Thereafter, counsel appeared for Dunn.  Rec. doc. 7. A first amended complaint was filed naming the State of Louisiana through WCI and James Miller ("Miller"), individually and in his capacity as former warden at WCI.  Rec. doc. 8.  The parties consented to trial before a Magistrate Judge.  Rec. doc. 25.  The defendants moved to dismiss the complaint.  Rec. doc. 29.  Dunn filed a second amended complaint restating her allegations and

---

[1]  Since Dunn's employment was terminated, the prison name was changed to Rayburn Correction Center.

naming the defendants as DOC and Miller.  Rec. doc. 33.

Dunn's original complaint alleged violations of both Title VII and 42 U.S.C. § 1981.  All reference to Section 1981 was deleted from the first and second amended complaints.  Rec. docs. 8 and 33.  The defendants' request for dismissal of her Section 1981 claims was denied as moot.  The motion to dismiss the claims asserted against Miller was granted because Title VII applies only to employers and individuals are not liable under Title VII in either their individual or official capacity.  Ackel v. National Communications, Inc., 339 F.3d 376, 381 at n.1 (5th Cir. 2003).  The motion to dismiss the Title VII claims against DOC was denied.  Rec. doc. 35.  Because the State's liability is limited to compensatory damages, the motion to dismiss was granted as to Dunn's claim for punitive damages and attorney's fees.[2]  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 2762 (1981).

## LEGAL STANDARD

Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[2]  In her opposition to the motion for summary judgment, Dunn contends that she was terminated in violation of La. Rev. Stat. Ann. § 17:471D, which provides that:

> A permanent teacher employed by the Department of Corrections shall not be disciplined or removed from office except upon written and signed charges of wilful neglect of duty, incompetence, dishonesty, or violation of the rules and regulations governing employees of the department, and then only if found guilty of such charges after a hearing by the Department of Corrections.

Dunn's complaint, as amended, did not assert any state law claims for relief.  To the extent that Dunn is now attempting to do so, the effort is not timely.

party is entitled to a judgment as a matter of law." <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).  <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990).  To that end, the court must "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." <u>Wyatt v. Hunt Plywood</u>, 297 F.3d 405, 409 (5th Cir. 2002).  Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); <u>Washington v. Allstate Ins. Co.</u>, 901 F.2d 1281 (5th Cir. 1990).

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the non-movant's case. <u>Celotex</u>, 106 S.Ct. at 2553; <u>see Lujan</u>, 110 S. Ct. at 3187.  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the non-movant's response.  If the movant does, however, meet this burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 106 S.Ct. at 2553-54.  A dispute over a material fact is genuine, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Kee v. City of Rowlett Texas</u>, 247 F.3d 206, 210 (5th Cir. 2001).

This burden is not satisfied with "some metaphysical doubt as to the material facts," <u>Matsushita</u>, 106 S.Ct. at 1356, by "conclusory allegations," <u>Lujan</u>, 110 S. Ct. at 3180, by "unsubstantiated assertions," <u>Hopper v. Frank</u>, 16 F.3d 92 (5th Cir.1994), or by only a "scintilla" of evidence, <u>Davis v. Chevron U.S.A., Inc.</u>, 14 F.3d 1082 (5th Cir.1994).  The court resolves factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  The court does not, however, in

the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.

See Lujan, 110 S. Ct. at 3188.   Summary judgment is appropriate in any case "where critical

evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of

the non-movant." Armstrong v. City of Dallas, 997 F.2d 62 (5th Cir.1993).  If the nonmoving party

fails to meet this burden, the motion for summary judgment must be granted.  See Evans v. City of

Bishop, 238 F.3d 586, 588-89 (5th Cir. 2000).

In Fierros v. Texas Dept. of Health, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit cautioned

that summary judgment is not favored in claims of employment discrimination and that the Supreme

Court in Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 2110

(2000), emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating

summary judgment evidence, courts must refrain from the making of credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts, which are jury

functions, not those of a judge.  Fierros, 274 F.2d at 190-91.

## PLAINTIFF'S CONTENTIONS

Dunn, pursuant to Title VII, 42 U.S.C. § 2000e, alleges that:  (1) she is an African-American

female who was hired by DOC in 1995 as a teacher of inmates at WCI; (2) in June, 2001, Miller

became the warden; (3) shortly after his promotion he began creating a hostile work environment

because of her race; (3) other teachers, who were Caucasian, were treated more favorably than she;

(4) although she complained about the hostile environment, Miller's conduct persisted; (5) as a

result of the hostile work environment she was required to seek medical care; and (6) DOC

terminated her employment under false pretenses.  Dunn makes two claims:  first, a hostile

environment claim based on her race; and second, a claim for disparate treatment on account of her

race resulting in her termination.

## DOC'S RESPONSE

DOC contends that Dunn cannot meet the burden of proof required for either claim.  It contends that she was terminated when she exhausted all of her leave time and did not return to work.

## UNDISPUTED FACTS[3]

1.   Dunn, who is an African-American woman, graduated in May, 1977 from Southern University in Baton Rouge with a B.S. degree in secondary education (social studies/history).[4]  She went into the Army as a clerk/typist for three years.  Dunn at 21.  Thereafter, she followed her husband in his assignments with the Army until they separated in 1991.  Dunn at 22-23.  She returned to her hometown, Bogalusa, where she worked as a substitute teacher for Washington Parish schools until she was hired by WCI.  Dunn at 23.  She had no prior experience teaching prison inmates.

2.   Dunn began her employment at WCI on June 5, 1995 as an instructor.[5]  At that time Miller, a Caucasian, was the assistant warden for security at WCI.[6]

3.   Dunn possessed a type "C" certification from the Louisiana Department of Education.[7]

---

[3]  The parties submitted separate statements of undisputed facts.  The following list is based on the court's review of the exhibits submitted by both parties.

[4]  Rec. doc. 41, Exhibit E, Deposition of Ceolia Dunn ("Dunn") at 20.

[5]  Rec. doc. 41, Exhibit A, Affidavit of Nanette Alford, Human Resources Supervisor at WCI ("Alford") at para.6.

[6]  Rec. doc. 41, Exhibit C, Deposition of Warden James Miller ("Miller") at 9.  Miller had one year of college.  He began working for DOC at Dixon Correctional Institute as a cadet in 1976.  In 1979 he was transferred to Wade Correctional Center where he remained for about fourteen years.  From Wade he went to WCI.  Miller at 7-9.

[7]  Rec. doc. 41, Exhibit D, Deposition of Wayne Cook ("Cook") at 24.

4.  In 2001, Miller was promoted to warden at WCI.  Miller at 9.  WCI's staff was organized into departments including, security, treatment, business office, personnel/payroll, mental health and education.  Miller at 12.

5.  The education department was under the supervision of Jerry Young, the director of classifications with responsibility for job and dorm assignments for all inmates.  Cook at 19 and Miller at 12-13.  There were two teachers in the education department, Julius Fekete and Dunn. Dunn taught a job skills class in the education building.  Cook at 15.

6.  When Miller became warden, he increased the inmate education programs in an effort to avoid recidivism.  Miller at 19.

7.  In April, 2002, Wayne Cook, a Caucasian, was hired as chaplain and education director at WCI.[8]

8.  After Cook was hired, Miller appointed Fekete principal and Dunn assistant principal. Cook at 18.  As principal and assistant principal, Fekete and Dunn supervised the inmate tutors. Cook at 18.

9.  Around August 2002, Cook requested that the Louisiana Department of Education provide Dunn with an extension of her type "C" certification for three years without requiring her to take additional course work.  Cook at 33.  The certification was issued and was valid until April

---

[8]  Cook at 14-16.  Miller testified that he believed Cook was hired in 2001.  Miller at 13.  In 1974, Cook received a BA degree in education (social studies) from Louisiana College.  He taught school for five months.  After a year and a half in South Carolina working on a tobacco farm and in a furniture store, he entered the New Orleans Baptist Theological Seminary in January, 1976 as a full-time student and earned a Master of Divinity degree.  He remained at the seminary and earned a doctoral degree (ThD.) in preaching and counseling in 1981.  Over the next twenty years he served twice as pastor of a church in Baton Rouge for about 3 to 4 years each time; he was a seminary professor for 11 years at a small Baptist seminary in Canada; he was a pastor and part-time religion teacher in South Dakota; and he taught English and Social Studies at a Baton Rouge high school for one year.  Cook at 5-14. He was certified by the Louisiana Board of Education to teach English and Social Studies. He passed the National Teachers Examination ("NTE").  Cook at 12.  Prior to his employment at WCI, Cook did not have any experience teaching prison inmates.  After his employment at WCI, he continued to work as a pastor of a church.  Cook at 47.

2005.  EEOC 60.[9]

10.  On October 13, 2003, Dunn was teaching a class in the education building, when an inmate student, Alfred Berry, sat facing her and exposed himself.  Berry was placed in administrative segregation.  Dunn was found to be in violation of an employee rule against malfeasance because she failed to report the incident at the first opportunity.  She was reported as saying that:  (a) when the incident occurred she looked for security but could not find anyone; (b) she went to the bathroom to compose herself; and (c) she was shocked and did not think clearly.  A letter of counseling was issued because the seriousness of the incident was mitigated by her lack of experience with that type of offense.  EEOC 102-03.

11.  Berry was prosecuted, pled guilty and was sentenced to additional time in prison.  Miller at 41-42.

12.  In addition to other facilities, WCI had an education building, dining hall and kitchen, and a gymnasium.  Miller at 19.

13.  There were not sufficient classrooms in the education building for the increased education programs.  Miller at 19.  The education department had doubled in size and there were only two teachers to supervise about 250 students.  Cook at 33.

14.  The gymnasium was used as a classroom, but Miller determined that it was not satisfactory because it was not air conditioned and with its fans it was noisy.  Miller at 19 and Cook at 36.

15.  Miller decided to use the dining hall between meals rather than the gymnasium.  Miller at 19-20.

---

[9]  Rec. doc. 41, Exhibit B, EEOC records of Ceolia Dunn with Bates numbers ("EEOC" 60).

7

16.  The classrooms in the education building were more conducive to teaching than the dining hall.  Cook at 36-37.

17.  In March, 2004, Dunn was assigned to teach an entry level education program in the dining hall.  Cook at 33-34 and Miller at 48.

18.  Dunn complained to Cook about the conditions in the dining hall, including the presence of bad odors and noisy distractions.  Cook at 35.

19.  Cook required that Dunn prepare a description of her job.  Dunn at 48 and Cook at 54.

20.  Berry, the inmate student who had exposed himself to Dunn in October, 2003 was one of the students in the entry level education program in the dining hall.  Miller at 51-52.  Berry was in Dunn's class for some months.  After she spoke to Fekete about Berry's presence, he was removed from her classroom.  Cook at 37-38.

21.  One of Berry's friends, Nathaniel Brown, was in the same class.  Brown made gestures that Dunn described as offensive.  She reported Brown and he was removed from her classroom permanently.  Dunn at  44-45.

22.  In 2002 and 2003, Deborah Cook, the wife of Cook, was employed part-time at WCI teaching college courses to inmates at night.  She also did some volunteer work at WCI on curriculum development.  Cook at 39-40.  The part-time college teachers like Cook's wife, were required to have a master's degree and at least 18 credit hours in the area they were teaching.[10]  Cook at 43.  When Cook's wife expressed interest in a full-time teaching position at WCI, Cook stepped away from the hiring process in accord with WCI policy.  Cook at 44-45.  In May, 2004,

---

[10] Deborah Cook possessed a masters degree in religious education.  She had a type "C" certificate with certification in Social Studies and German.  EEOC 61.  When she was hired for the full-time position, she had experience teaching inmates college classes for the preceding two years.  Cook at 41-42.

Deborah Cook was hired full-time by WCI.  Cook at 38.

23.  Deborah Cook was assigned to teach in a classroom in the education building.  Cook at 64-65.

24.  On July 2, 2004, Dunn submitted a written grievance concerning her assignment to the dining room.  She objected to the fact that Deborah Cook, who was recently hired, was assigned to teach in the education building while she remained in the dining room.  She objected to conditions in the dining room, including the noise level, dirty, sticky floors, smelly odors and flies.  She reported occurrences where security left her alone with 40 to 60 inmates and the fact that Berry was placed in her class.  She contended that Deborah Cook was being given preferential treatment because she was married to Cook.  She did not mention Deborah Cook's race.  She requested that she be placed in a regular classroom.  EEOC 65.

25.  On July 22, 2004, Miller wrote to Dunn concerning teacher certification.  He described her as the only teacher with temporary certification and reported that her certification must be renewed in April 2005.  He reported that in order to gain certification, she had to take six credit hours in her field and pass the PRAXIS exam in her field.  EEOC 59.  Dunn responded that she was enrolled at Southern University and was working toward certification in special education.  EEOC 92.

26.  On July 28 and 29, 2004, Dunn went out on sick leave.  She worked part of the day on July 30, 2004 and did not return to work thereafter.  Alford at para. 7.

27.  As of July 28, 2004, Dunn had accumulated 557.768 hours in sick leave.  Alford at para. 8.

28.  On July 30, 2004, a hearing was conducted on Dunn's grievance.  EEOC 64.

29.  On August 3, 2004, M.L. McCloud, executive staff officer at WCI, wrote to Dunn and notified her that her grievance was denied.  McCloud reported that:  (a) Dunn had specified that her grievance concerned the building in which she was assigned to teach; (b) her work assignments were subject to change as deemed necessary by her supervisor; (c) the change to the dining room was done in response to the need for direct supervision of inmates assigned to the education program in the dining room; (d) the room in the education building could not accommodate the 65 inmates in the dining area; (e) these students were at the grade levels 1-3; (f) Dunn was the only teacher that had not passed either the NTE or PRAXIS exams;[11] (g) therefore it was decided to place Dunn with these students; (h) Dunn was assigned to the dining hall for one month when Deborah Cook was hired; (i) Deborah Cook had a master's degree in education and, with the exception of her dissertation, she had completed the requirement for her doctorate in education; and (j) Deborah Cook was assigned GED students in the education building. EEOC 64.

30.  Wendy Miller, a Caucasian, was hired as a teacher about a month after Dunn went out on leave.[12]  Cook at 65.

31.  On August 16, 2004, Dunn completed an EEOC charge questionnaire, which included the following:

> I have been employed at WCI for 9 years, recently my supervisor's wife was hired as an instructor.  I was taken out of my classroom and assigned a "hostile environment".  The institute use [sic] the institute's kitchen as a classroom of over 50 adult inmates. I, Ceolia Dunn was placed in the Instructor's spot, Mrs. Cook was

---

[11]  The Louisiana Department of Education records demonstrate that Dunn had not passed the social studies portion of the NTE exam.  EEOC 155.

[12]  Wendy Miller had worked for the Washington Parish School District for three years before working at WCI.  She was hired at WCI as a teacher.  She had a temporary teaching certificate while she worked on her masters degree in teaching.  Rec. doc. 45, Exhibit 7, Page 7 of Deposition of Wendy Miller.  There is no evidence that she was related to Warden Miller.  She was a member of Cook's church.  Cook at. 47.  She had no prior experience teaching prison inmates.

given my classroom along with a new computer, new desk, and chair.  I believe this action was taken against me because it was a "power struggle".  OR a lot of unfairness.  It has been a nightmare with mistreatment of me.

EEOC 12-13.

32.  On October 5, 2004, Gabriel A. Vargas-Bodas, M.D., a specialist in internal medicine, prepared a handwritten note regarding Dunn which stated:

Patient still having trouble psychologically to go back to work.  Patient on medicine for this ail... start psychotherapy in two weeks.  Need to _____ leave of absence for another 60 days.[13]

33.  Dunn exhausted the leave time allowed under the Family Medical Leave Act on October 22, 2004 and all of her sick leave on November 22, 2004.  Alford at paras. 9 and 10.

34.  On December 1, 2004, Miller notified Dunn in writing that she was recommended for removal from employment for exhaustion of all sick and FMLA leave.  She was required to submit a written response by December 16, 2004.  EEOC 67.

35.  On December 6, 2004, Dunn notified Miller in writing that she was under the care of two physicians and did not have a release from the physicians to return to work.  EEOC 72.

36.  On December 7, 2004, Dr. Vargas-Bodas faxed a note to Miller with the request that if he had any questions, he should call.  The note states, "[t]his patient continues to see me as an internist.  Next visit in January 2005.  Also seeing psychiatrist."[14]

_____

[13]  Rec. doc. 45, Exhibit 8 (the copy of the handwritten note is not completely legible).  It is not clear whether this note was sent to Miller.  Dunn's pleadings indicate that it was.  Rec. doc. 45 at p. 9.  See also no. 41 of Dunn's statement of undisputed facts attached to Rec. doc. 45.  The DOC's pleadings do not acknowledge that it was received by Miller.  There is no written evidence of its transmittal.  For purposes of this motion for summary judgment, it will be assumed that the note was sent to Miller.

[14]  Rec. doc. 45, Exhibit 9.  Dr. Vargas-Bodas submitted an affidavit dated September 26, 2007, which included the following statement:

That, although the second script, dated December 7, 2004, did not specifically state that Ms. Dunn was not medically ready to return to her employment at WCI, his opinion at that time

37.  Miller did not call Dr. Vargas-Bodas.  Rec. doc. 45, Exhibit 10.

38.  On December 20, 2004, Miller notified Dunn in writing that she would be removed from her position effective December 27, 2004.  EEOC 70.

39.  Miller made the decision to terminate Dunn.  Miller at 58.

40.  Dunn was terminated on December 27, 2004.  Alford at para. 6.

41.  After Dunn left WCI, the dining hall remained in use as a classroom when not in use at meal time.  A teacher was permanently assigned to the dining hall after Dunn left and teachers were not rotated through the dining hall.  Cook at p. 37.

42.  On April 7, 2005, Miller retired as warden at WCI.  Miller at 10.

43.  On May 13, 2005, Dunn submitted a charge of discrimination based on race (African-American) and age to the Louisiana Commission on Human Rights.  It provided that the discrimination took place between January 1, 2004 and December 27, 2004 at WCI.  EEOC 28.

44.  After Dunn was terminated, Cook hired Jean Knight, a Caucasian, as a teacher.  Cook at 42 and 67.  Knight was a member of Cook's church.  Cook at 48-49.

45.  On August 19, 2005, Cook gave up the position of director of education.  Cook at 58. He retained responsibility for the college program and some youth offender programs.  The position of director of education had to be filled by one of the existing teachers because there was no money to fund a new position.  Cook at 66-67.  Deborah Cook became director of education and principal. Fekete's title became a literacy teacher.  Cook at 67, and Rec. doc. 45, Exhibit 6, Deborah Cook

---

was that Ms. Dunn's medical condition had not changed since October 5, 2004; that in his opinion and he meant to advise to whomever concerned on December 7, 2004, Ms. Dunn was not medically ready to return to employment at WCI.

Rec. doc. 45, Exhibit 10.

deposition at 40.

46.  After Dunn's termination, there were no African American employees in the education

department at WCI.

## HOSTILE WORK ENVIRONMENT CLAIM

In <u>Ramsey v. Henderson</u>, 286 F.3d 264 (5th Cir. 2002), the Fifth Circuit held:

> A plaintiff may establish a Title VII violation based on race discrimination
> creating a hostile work environment.  In order to establish a hostile working
> environment claim, . . . (the plaintiff) must prove: (1) she belongs to a protected
> group; (2) she was subjected to unwelcome harassment; (3) the harassment
> complained of was based on race; (4) the harassment complained of affected a term,
> condition, or privilege of employment; (5) the employer knew or should have known
> of the harassment in question and failed to take prompt remedial action.  For
> harassment on the basis of race to affect a term, condition, or privilege of
> employment, as required to support a hostile work environment claim under Title
> VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's
> employment and create an abusive working environment.

> In determining whether a workplace constitutes a hostile work environment,
> courts must consider the following circumstances:  the frequency of the
> discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably interferes
> with an employee's work performance.

<u>Id</u>. at 268 (Citations and quotation marks omitted).  In <u>Harris v. Forklift Systems, Inc</u>., 510 U.S. 17,

114 S.Ct. 367 (1993), the Supreme Court held:

> [W]e can say that whether an environment is "hostile" or "abusive" can be
> determined only by looking at all the circumstances.  These may include the
> frequency of the discriminatory conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance.  The effect on the
> employee's psychological well-being is, of course, relevant to determining whether
> the plaintiff actually found the environment abusive.  But while psychological harm,
> like any other relevant factor, may be taken into account, no single factor is required.

<u>Id</u>. at p. 371.

Dunn contends that she was subjected to hostile harassment because:  (a) she was assigned

13

to teach classes in the dining hall rather than in the education building; (b) Cook demanded that she provide him with a description of her duties; (c) the inmate who exposed himself to her in October 13, 2003 was one of more than fifty inmates assigned to her class in the dining hall; and (d) Cook told Dunn that she would be terminated if she did not pass the PRAXIS exam.

It is undisputed that when Miller became warden there were two teachers, Fekete and Dunn, in the education building.  Miller wanted to increase the educational opportunities for inmates with the goal of reducing the rate of recidivism.  There were not enough classrooms in the education building to accommodate all of the classes and there were more than fifty inmates at the grade 1-3 level that were assigned to a class.[15]  Dunn testified that the largest room in the education building could hold about forty inmates.  Dunn at 16.  While Miller tried to use the gym for classes, he found it was unsatisfactory.

In March, 2004, Dunn was assigned to teach the class in the dining hall.  She complained about the conditions in the dining room.  After Deborah Cook was hired and assigned to teach inmates in the education building, Dunn filed her grievance and sought a classroom in the education building.  After Dunn was terminated, one of the Caucasian teachers was assigned to teach the class in the dining hall.  This situation was maintained through the time that Cook gave up his responsibilities as director of the education department.

Dunn's assignment to teach the class in the dining room does not constitute a hostile work environment.  One of the teachers had to be assigned to teach the dining hall class.  The alternative was to eliminate the class.  After Dunn went on leave, the class in the dining hall was maintained with a teacher permanently assigned to it.

---

[15]  Dunn said there were about fifty to fifty-three students in the class.  Dunn at 16.  McCloud, the executive staff officer at WCI, said there sixty-five inmates in the class.  EEOC 64.

14

It is undisputed that Cook required that Dunn prepare a job description.  Dunn states that the incident occurred while she was in the dining hall.  Dunn at 48.  This indicates it occurred after her assignment to the dining hall in March, 2004, and before she went on leave at the end of July, 2004.  There is no written record of the incident.  Dunn did not prepare the job description in front of him.  Instead, she went to the bathroom.  When she returned she provided Cook with the description.  Dunn at 48.  Both Dunn and Cook testified that Dunn told Cook that he was making her nervous.  Dunn at 48 and Cook at 54.  Cook testified that he was concerned that Dunn would have someone else write the description if he did not see her do it.

Dunn does not describe Cook's request as physically threatening.  There is no evidence that anyone else was present during the incident.  Dunn was a college graduate who had been teaching at WCI for nine years.  A request by her supervisor that she write out a description of her job duties is no worse than a teacher requiring a student to take a pop quiz.  Even accepting Dunn's description of the incident, it was not humiliating and it did not unreasonably interfere with her work performance.

Dunn contends that because Berry exposed himself in October, 2003 Miller created a hostile environment when Berry was assigned to the class in the dining hall.  Berry was criminally charged and convicted as result of the October, 2003 incident.  When Dunn was assigned to teach the class in the dining hall in March, 2004, Berry was one of the more than fifty inmates in the class.  Dunn contends that Berry's presence in the class was part of the hostile environment.  Miller responded that the prison must place some reliance on its prison disciplinary program in determining whether an inmate can be reassigned to a dorm or class.  Miller at p. 52-53.  After Dunn complained about the presence of Berry in the class, he was removed even though he did nothing offensive in the

dining hall class.  Later, when Dunn complained about Berry's friend, Nathaniel Brown, making offensive gestures in the dining hall class, he too was removed.  The mere placement of Berry in the dining hall class does not demonstrate a hostile environment, particularly in light of the fact that Berry and Brown were both removed from the class at her request.

Dunn contends that: (a) Cook told her she would be terminated if she did not pass the PRAXIS test in social studies; and (b) there was no requirement that she pass the exam.  It is undisputed that:  (a) her type "C" certification was renewed in the spring of 2002 for three years with assistance from Cook; (b) she had failed the social studies portion of the NTE exam; (c) she was the only teacher in the education program that had not passed the NTE or PRAXIS exams; and (d) her type "C" certification expired in April, 2005.  On July 22, 2004, Miller wrote Dunn that her certification must be renewed and she was required to pass the PRAXIS exam in social studies, her area of certification.  EEOC 92.  She responded that she was taking courses in special education. Id.  Neither Miller's request in July, 2004 that Dunn take action to renew her certification so that she remained eligible to teach nor Cook's demand that she pass the PRAXIS exam created a hostile environment.  Miller, the warden, and Cook, as the director of the education department, were responsible for requiring that WCI's teachers maintain their certification requirements.[16]  Dunn has not pointed to any prohibition against WCI requiring all of its teachers to pass either the NTE or PRAXIS exams.

A dispute over a material fact is genuine if the evidence is such that a reasonable jury could

---

[16]  Dunn relies on the testimony of Wendy Miller, who reported that she had a temporary teaching certificate because she was working on her master's degree in education.  She was asked if her certificate had a letter.  She replied in the negative.  Rec. doc. 45, Exhibit 7, page 7 of Deposition of Wendy Miller.  Wendy Miller's testimony does not contradict Warden Miller's assertion that Dunn needed to take and pass the PRAXIS exam in social studies.

return a verdict for the nonmoving party.  Kee, 247 F.3d at 210.  Dunn has not presented evidence

on which a reasonable jury could determine that she was subjected to a hostile work environment

as described in Harris and Ramsey.

## DISPARATE TREATMENT CLAIM

The shifting burden of proof in a Title VII disparate treatment case resulting in the

termination of the employee  is well settled.  The burden of persuading the trier of fact that the

defendant employer intentionally discriminated against the employee remains at all times with the

plaintiff.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 2749 (1993).  In St.

Mary's Honor Center, the Court clarified the burden of proof originally established in McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).  Under this model, Dunn must initially

establish a prima facie case of discrimination.  Id.

To establish a prima facie case of discrimination, Dunn must prove each of the following

essential elements:  (1) she is a member of a protected class; (2) she was qualified for the job; (3)

she suffered an adverse employment action because of her membership in a protected class, and (4)

employees outside her class were treated more favorably than she was.  Texas Dept. of Community

Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089 (1981).

Once Dunn establishes a prima facie case, the burden shifts to DOC to produce a legitimate,

non-discriminatory reason for its decision.  Burdine, 101 S.Ct. at 1094.  Its burden at this initial

stage is one of production only.  That is, it need not persuade the Court that its reasons are

legitimate; it need only come forward with some explanation which, if believed, would be legitimate

and non-discriminatory.  Bodenheimer v. PPG Industries, Inc., 5 F.3d 955, 958 (5th Cir. 1993).  Once

it meets its burden of production, Dunn must present competent summary judgment evidence that

17

DOC's proffered reason is false and that unlawful discrimination was the true reason behind the employment action.  Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993-95 (5th Cir. 1996).  An employee's own subjective belief of discrimination, no matter how genuine, cannot create a genuine issue of material fact to defeat summary judgment.  Nichols v. Loral Vought Sys. Corp., 81 F.3d 38, 42 (5th Cir. 1996).

"[T]o establish a prima facie case, a plaintiff need only make a very minimal showing." Thornburg v. Columbus & Greenville R.R. Co., 760 F.2d 633, 639 (5th Cir. 1985).  DOC's motion does not challenge Dunn's evidence at this point in the analysis.  It will be assumed that Dunn established a prima facie case.  DOC contends that the only reason it terminated Dunn was that she had exhausted all of her FMLA and sick leave and did not return to work.  This is a legitimate, non-discriminatory reason for its decision.

Dunn may establish pretext by demonstrating that DOC's proffered explanation is false or unworthy of belief.  Reeves, 120 S.Ct. at 2106.  An explanation is false or unworthy of credence if it is not the real reason for the employment action.  Laxton v. GAP, Inc., 333 F.3d 572, 578 (5th Cir. 2003).  When an employer offers inconsistent explanations for its employment decision at different times, it may be inferred that the employer's proffered reasons are pretextual.  Gee v. Principi, 289 F.3d 342, 347-48 (5th Cir. 2002).  Here, there has only been one explanation for Dunn's termination; she did not return to work before she exhausted all available leave.  Dunn was on leave from July 30, 2004.  She exhausted her leave on November 22, 2004.  She was terminated on December 27, 2004 or nearly five months after her last day of work.  There has been no inconsistency in DOC's

explanation for her termination.[17]

What Dunn presents is evidence that she or her doctors responded to Miller's letters.  On October 5, 2004, Dr. Vargas-Bodas wrote a note requesting an additional sixty days of leave for Dunn because she was psychologically unable to return to work.  Rec. doc. 45, Exhibit 8.  Dunn's leave was exhausted on November 22, 2004.  Alford at paras. 9 and 10.  On December 1, 2004, Miller notified Dunn that she was recommended for removal from employment at WCI because she had exhausted her leave.  EEOC 67.  He required a response by December 16, 2004.  Dunn wrote Miller on December 6, 2004 that she was under the care of two physicians and did not have a release to return to work.  EEOC 72.  She did not contest the fact that she had exhausted her leave nor does she do so now.  The next day, Dr. Vargas-Bodas faxed a second note to Miller reporting that Dunn remained under his care.  Rec. doc. 45, Exhibit 9.  He did not report that she could not return to work, but in an affidavit he reports that he meant to advise that she was unable to return to work at WCI.  Rec. doc. 45, Exhibit 10.  Dunn contends that Miller should have called Dr. Vargas-Bodas to clarify the December 7, 2004 note.

In describing WCI's policy for employees who have exhausted their leave, Miller testified that:

> It was pretty standard.  Once they ran out of FMLA and sick leave, if they couldn't give me a definite short-term date when they were going to be back, I mean, I separated them.

Miller at 64.  Dunn has not presented any evidence to contradict this testimony.  She does not contend that other employees were allowed to return to work after they exhausted their sick leave.

---

[17] Dunn also contends that DOC failed to provide her with due process as required by Louisiana law.  The record, however, reveals that she appealed her dismissal to the Louisiana Department of Civil Service.  She was notified that her appeal was not timely and was given an opportunity to explain the reason for the delay.  Because she did not respond, her appeal was dismissed.  EEOC 449-451.

The affidavit from Dr. Vargas-Bodas does not state that Dunn could return within a short period following the exhaustion of her leave.  Dunn has not established that DOC's reason for terminating her was false or unworthy of belief.

Dunn has not met her burden on either the hostile environment claim or the claim for disparate treatment in her termination.  DOC's motion for summary judgment must be granted.

IT IS ORDERED that the defendant's motion for summary judgment (Rec. doc. 41) is GRANTED.

New Orleans, Louisiana, this 23rd day of October, 2007.

**SALLY SHUSHAN**
**United States Magistrate Judge**